Case number 15-1084 et al., Settling Devotional Claimants Appellant v. Copyright Royalty Board and Librarian of Congress. Ms. McLean for Settling Devotional Claimants, Mr. Boydson for Independent Producers Group, and Ms. Silfen for Copyright Royalty Board. May it please the Court, I'm Matthew McLean. I represent the Settling Devotional Claimants, a coalition of religious ministries that produce devotional television programs for broadcast. I'd like to reserve two minutes for rebuttal. In distributing the cable royalty funds for the year 1999, the Copyright Royalty Board erred in two important respects, both to the detriment of the Settling Devotional Claimants, or the SDC, and both of which involved a failure to give the SDC notice and an opportunity to be heard. First, there was a surprise sanction against the SDC that allowed our opponents, IPG, to claim the disputed value of the program Kenneth Copeland Programming, which was the most valuable programming claimed by IPG in these years, and we were given no notice or opportunity to challenge that sanction. The second error was the Board's application of a distribution methodology of the Board's own invention, ignoring the value of the SDC's Oral Roberts Programming, which was the most widely retransmitted devotional program in 1999. The Board offered no reason to exclude this programming. The SDC never had, because it was first presented in the Board's final distribution decision, the SDC had no opportunity to address this error. So I'd like to first address the error of the surprise sanction. This was the sanction based upon our alleged mislabeling of requests for witness testimony as requests, rather than, as the Board apparently intended, but did not clearly say, requests and not subpoenas. The Board rejected the request and referred to this conduct, this mislabeling by the SDC, as egregious misconduct for the purpose of trying to deceive a witness, and admitted that but for what it termed as egregious misconduct, the Board would have sustained our objection to the admission of the deposition transcript. Now, I personally prepared those requests for witness testimony. There was absolutely no intent to deceive, and nobody was deceived. The first thing I did when I received that written order authorizing us to send those requests was to call my opponent, Brian Boydston, IPG's counsel, and talk about what to do. And we agreed on that phone call, and it's memorialized by email, that the witness would be produced voluntarily, that she would appear for the deposition, that Mr. Boydston would accept service of the request on the witness's behalf, and he was authorized to do so. I went back to my computer. I followed the written order as I understood it. I prepared the requests in the form of a subpoena. I clearly labeled them as requests and not as subpoenas. And we served those requests on Mr. Boydston as we had agreed. Along with the request, we served a copy of the written order that explained that these were voluntary requests, and obviously Mr. Boydston, as IPG's counsel, was aware of that. I had no contact directly with the witness, had no contact with the witness except through counsel, counsel who was clearly aware of the order, of the voluntary nature of the request. I then coordinated logistically with Eagle Mountains counsel, who was also present along with IPG's counsel at the deposition. All counsel were aware that these were voluntary requests. The witness was aware, too, because she refused to produce documents in accordance with the request, as was her right to do. And we didn't raise an issue of it because everybody understood it was voluntary. At the deposition, I said and Eagle Mountains counsel also said multiple times on the record, your appearance here is voluntary. This is a voluntary deposition. You're not required to be here. And in fact, Eagle Mountains counsel used her voluntary appearance as a basis to instruct her not to answer my questions. And that's what happened. I questioned her, including about the Senate report, which was our evidence, that Eagle Mountain did not own the copyright to the Kenneth Copeland programming, and the witness refused to answer any questions about it. However, and I terminated the deposition, ultimately, because of her refusal to ask questions, which I believe was the proper course of action. Over my objection, IPG's counsel recommenced that closed deposition, questioned her about it. She answered his questions, but not mine. And then we objected at the hearing to the admission of that deposition testimony over that I objected to. Nobody, neither Eagle Mountain, nor Ms. Harbour, the witness, nor IPG, ever before, during, or after that hearing, ever raised an issue about the mislabeling, the alleged mislabeling of the request. It simply wasn't an issue. And Mr. McLean, how does that prejudice you, given that if you had not had an opportunity to depose Ms. Harbour they would have presented a declaration of her testimony, presumably along the same lines as what they elicited in the deposition, and that would have been confident evidence before the royalty? Well, Your Honor, IPG speculates that that declaration would have come into evidence. Well, wouldn't that be ordinarily? I mean, isn't that how, if you don't depose people, you prove a claim or not? Not entirely, Your Honor. The Board has discretion as to whether to admit hearsay. And so that would have been hearsay. We objected as hearsay. We made arguments as to why it wasn't reliable. Ultimately, the Board rejected it, in part on the basis that it would have been duplicative of her deposition testimony. But it would be speculative to say whether that evidence would have come in had the deposition testimony not come in. It would also be speculative as to what weight the Board would give that declaration, as opposed to her oral testimony. We just don't know. And this is why we need to, we hope to find out on remand. But if you, even, you have a good argument that your labeling was, your mislabeling was not egregious. But to follow up on the question of how are you prejudiced, if, even if that, you don't have a deposition and you can't get that in as a declaration, isn't the Copyright Board going to presume the answer to this question? So how does it prejudice you? The Board applies a presumption in favor of copyright ownership. But in this 1999 decision, you'll see the Board has not fully articulated the contours of that presumption. Whether, for example, the presumption is defeated simply by offering evidence and rebutting it, or whether the burden of proof is on the party seeking to rebut it. This is a question the Board has left open, expressly leaves open, in their decision here. The Board did not say that our evidence, the Senate report, was insufficient to overcome the presumption. They said it was insufficient to overcome IPG's evidence. The only evidence IPG offered on this subject was the deposition testimony, which was admitted only as a result of what the Board termed egregious misconduct. I want to very briefly, in my short remaining time, address our second point of error, which was again based on a failure to give notice and an opportunity to respond. The Board adopted a distribution methodology of its own making, excluding the value of Oral Roberts Program. We don't take issue with the fact that the Board rejected our methodology and IPG's methodology. Or that it applied a ratings methodology, a local ratings-based methodology. We do take issue with their failure to inform us and give us an opportunity. What the Board could have done is exactly what any other agency does in the context of the Administrative Procedures Act, which is to let us know what they are planning to do and to give us a reasonable opportunity to respond. This is exactly what this Court said, and I believe it was then Chief Judge Edwards, in the RIA versus Library of Congress decision. This was involving a predecessor tribunal to what is now the Copyright Royalty Board. A matter in dispute must be properly raised before the arbitration panel so that the parties have a fair opportunity to address it. But this issue was raised. Both sides presented their positions and the Royalty Board made its judgment, you know, taking the greens and blues from this side and the reds and the pinks from that side and mixing it up, and it wasn't the color either of you had proposed, but it derived from them, no? This is not rulemaking, this is administrative adjudication. Your Honor, at the end of the day, what the Board did in this case is exactly what the Board did the last time we were here before this Court, settling devotional claimants versus Copyright Royalty Board, which this Court decided in 2015. That decision came shortly after the Board's decision in this 1999 case, so unfortunately the Board did not have the benefit of the Court's reasoning when it came up with this decision. But they took elements, they took pieces of data, plucked them out of context, used them for purposes other than what the data was presented for in order to reach a result-driven decision approximately in the middle. They did it with respect to our data by applying a data set that was meant for a computational purpose other than what it was applied, and that's why they left out Oral Roberts' programming. There's no rational basis to leave out Oral Roberts' programming. It was purely a result of the fact that they took this data set that was intended for a different purpose and they didn't give us an opportunity to say, wait, that's leaving out one of our most valuable programs, a program that, under a distant viewing standard, outweighed, had received more distant viewing than all of IPG's programs put together. And that's why we're prejudiced when the Board goes about it this way. And you didn't object to the Royalty Board's determination that they lack authority to issue subpoenas? That's not before us, is it? No, Your Honor, we asked for a subpoena. Right. The Board ruled that it doesn't have that authority. Right, and that's not something that's before us. That's not on appeal. We haven't challenged, we don't necessarily agree, but it's not on appeal. Your Honor, as to the assignments of error that IPG has raised, we're willing to stand on our briefs. We would ask this Court to reverse the sanction, to remand for further consideration as to the ownership of Kenneth Copeland Programming, and to give us an opportunity for the first time to challenge the Board's exclusion of Oral Roberts from its distribution award. All right, thank you. Good morning, may it please the Court. Brian Boyce on behalf of Worldwide Substitute Group, doing business as Independent Producers Group, also referred to as IPG. I'd like to start right where we left off, if this seems to make sense, with regard to the issue about the CRB's ultimate decision. I think, Judge Pillard, you hit the nail on the head. This was not a rulemaking endeavor. This was adjudication. What the Code requires is that the judges, the CRB judges, have hearings, listen to evidence, listen to different methodologies, and then make a decision and craft a distribution methodology themselves. That's what they did here. As you put it, they took some of this, and they took some of that, and this is what they gave us. Therefore, there's no need for them to give the SDC or anyone further notice and say, well, let's continue this and have more brief writing and more hearings and everything else. They already had done that. They said, okay, we've got a record before us. We are going to use what we like from that record to come up to craft an adjudicatory result. And that's what they did. There's no reason for them to have issued notice saying, hey, let's relitigate this over and over again. It would be tantamount to a trial court, after the jury returns a verdict, saying, you know what, let's bring the jury back in and let's have some more testimony. I mean, it's simply not procedurally what's required. The other issue that the SDC, of course, raises is with regard to this whole Kenneth Copeland issue. I submit to your honors, it's harmless error if it is error at all, because the fact of the matter is that the judges did say in their decision that they found the Senate hearings completely unreliable, full of hearsay. And, in fact, I'll remind you, as we pointed out in our briefs, the SDC originally ellipsed out important parts of that Senate testimony when they presented their argument in writing to the CRB. We saw that and explained the entire context of those comments. And the entire context of those comments, which we repeat in our papers that we presented to you, make it very clear that even at that Senate hearing, for whatever it's worth, there was no indication and no evidence of any sort that said that Kenneth Copeland Ministries did not own the TV programs in question. In fact, there was even a specific section where they said, well, we have books and we have this and we have the other, and then we have media stuff which Kenneth Copeland Industries owns. Mr. Copeland and Mrs. Copeland don't own that. Kenneth Copeland Ministries Inc. owns that. So even if you want to get into the quality of the Senate report, there's no evidence there that questions the ownership. And, in fact, it is consistent with the fact that Kenneth Copeland Ministries does own Kenneth Copeland Ministries programming, which should seem obvious. Then we have the matter of this quasi-deposition or whatever you want to call it. Now, the fact of the matter is that the CRB said, I mean, this is a very unusual animal. This doesn't fall within the rules of civil procedure. It doesn't fall within actually any of the regulations really. This was sort of made out of pull cloth. But what they did do is they said, we are issuing a specific edict that you can ask questions of this witness if they appear voluntarily on these subjects and enumerated the subjects, which were the ownership of these programs. So then we get the deposition, and Mr. McClain doesn't want to talk about any of that off the bat. He wants to ask about personal contracts for the Coens individually, the Coens individually. And counsel for Kenneth Copeland Ministries, not me, as was said in the decision by the CRB, I said nothing on this. They weren't my client. Counsel for the deponent said, we're not going to answer that stuff because it's not within the edict that was issued by the CRB allowing this whole deposition-like process to go forward. And so then Mr. McClain said, well, let's end this right now. And I said, well, I'm not ending it right now. I'm not required to stay within the scope of what you asked. There's nothing that says that. I'm going to ask the questions that the CRB said could be asked. And they were very simply, who owns these programs? And they gave a simple, straightforward answer. And that was then presented to the CRB. And the CRB said, well, this is all clear in here. We'll accept this. And the only reason they didn't accept the declarations by the Copelands and their staff that we presented was essentially because they said it's not necessary because we have the deposition transcript. So this is a tempest in a teapot. If that was error to sanction the SDC and allow in the deposition, it was harmless error because, number one, there's no evidence that Ken Copeland Ministries doesn't own its own programming. It's just a pipe dream. And on top of that, the evidence that there was admitted was a sworn deposition-like testimony confirming that fact. And there were these declarations which would have been accepted had that not been there. I'd like now to turn to the issues that we raised on appeal. The first one is with regard to Adventist media. Now here, getting back into the same subject matter to a degree, and Judge Plard, you asked a question in this regard about, isn't this kind of how you do these things? You present declarations to prove your points. Sometimes, by and large, yes, we present declarations. Because the CRB is allowed to accept hearsay evidence, that flies normally. And I would point out in the case of the Warren Judd declaration, which made it very clear that Adventist was the distributor of the TV shows in question and had control of them and was authorized to collect these royalties. The CRB admitted it and then excluded certain paragraphs, all the important paragraphs. Notably, in the subsequent proceeding for the years 1999 to 2009, this same declaration was submitted to the CRB, and they accepted it. There is no rhyme, reason, or logic why there is that inconsistency. And I would submit to you that it was just a mistake they made to say, we're not going to consider a sworn declaration by Warren Judd making very clear who has the authority to get this program. I mean, it was just an arbitrary and capricious knee-jerk reaction that I don't know why it happened or what the... But it falls very clearly within the scope of something that's arbitrary and capricious, as is illustrated over the top by the fact they allowed it in a subsequent proceeding. With regard to the SDC methodology, the SDC methodology should never have been admitted. It should have been excluded. That's why we brought the original motion to knock it out. That's why, according to the CRB's direction, we brought it in again as a motion to eliminate. Clearly, the SDC admittedly did not have access to all the intermediate files that were in support of its methodology and said they couldn't produce it. They also said that it was also clear that, and this is very important, that when it came down to it, they could never explain how it was they derived the set of stations they were using for their study. Out of 700 possible stations, they had chosen 72 without any rhyme or reason, and they couldn't even tell us who came up with that list. They thought it was Marsha Kessler, a person at the NPAA, but then it turned out that that was not the case because the list that Ms. Kessler had come up 10 years prior didn't match the list that the SDC were using. From a statistical standpoint, this is very important. One of the bedrock things you've always got to know is if you're taking a sample of a whole, you have to explain how it is you chose that sample and why it's representative or not. And that was just never, ever, ever done, and yet the CRB decided to just gloss over that despite an obvious problem. Well, you're arguing against the NPAA data, but the Royalty Board decides not to use the NPAA data. They decide to use the Nielsen data instead. Well, the Nielsen data was data relied upon by the NPAA study. That is the NPAA. Among the data by itself, it doesn't have that same flaw that you were just identifying, does it? I beg your pardon? It doesn't have the same flaw that you were just identifying, does it? Yes, it does. The Nielsen data? Yes, I mean, that was the whole thing that was— See, what happened here is the SDC didn't really do their own methodology per se. They took a bunch of data, and they took Mr. Witt, who worked for the NPAA before, and they tried to bootstrap that into their own methodology. That might work. That might be fine. As it turned out, it wasn't. Amongst other things, when they looked at their station sample of 72 that they thought had been chosen by a person at the NPAA, it wasn't. I don't know, and Sarah explained how one got to the other, but it was not the same 72 stations. And in addition to that, they couldn't even make a foundational presentation as to their data because they didn't collect it. The NPAA did, and the NPAA got it from Nielsen. So there's several levels. So your objection is not to Nielsen data per se. It's to the choice of which areas to include. Well, there's the stations that were chosen. That's one issue. With regard to the Nielsen data, our point is that there's no foundation for it. There are two levels of other parties preparing this stuff, and therefore, there's no basis for it. The other thing, too, quickly, is that this was a viewership-based study, and the President is there from CRT and the CARB saying a viewership-based study measures the wrong thing because what we're looking at here is not people sitting in their homes watching TV, but cable system operators, which we call CSOs, deciding whether or not to purchase a particular station's broadcasting or not. That is what this is supposed to reflect. I thought the reduction of viewership models was for Phase 1, not for Phase 2. There is no rational distinction as to why it would be any different between Phase 1 and Phase 2. In Phase 1, you're dividing the pie into categories like sports, religious, et cetera. In Phase 2, you're dividing those individual categories amongst individual people, claims, if you will. There is no logical reason why the viewer-based study flaw is any different at Phase 1 or at Phase 2, and no one has ever practiced that. Doesn't our IPG decision in 2015 say that it does make sense to make a distinction? In our IPG decision in 2015, I thought we said it does make sense, different considerations. There's no rational reason to explain why that is. It's like saying that the first three innings of a baseball game are fundamentally different than the second three innings of a baseball game. You can say that, but no, it's the same players. No, there just simply is no difference. To understand, you have to go back. What is the meaning of viewer-based study? What is all this about? It's about what is important to the person who spends the money to pay this license in the first place. Well, the person who spends the money to pay this license in the first place are not viewers sitting at home choosing which show to watch. They are cable systems operators who are concerned about a Panoply program that they want to present to their subscribers, and so you have to focus on what that CSO is thinking. He doesn't care at all what the viewership is. What he cares about are what will my subscribers want, what will attract them, and that's why in different testimony and different proceedings along these lines, we've had people testify that sometimes a particular CSO may pay a premium for a broadcast station because it includes Korean broadcasting, and he has a Korean community in his community. Even though those ratings are terrible, that's what he will do because that's what he's looking at. That's why the IPG study looks at things like subscribership, et cetera, et cetera, et cetera, and not viewership because we didn't make this up. As the CRT and the CARP said years ago after going through extensive hearings in 2004, issued a decision saying looking at viewer-based studies measures the wrong thing. It measures how many people sitting at home are watching something, not what the CSO wants to do. But isn't that what matters when you're assessing copyright violation, when you're saying to what extent has the copyright holder's right been impaired? It's impaired by someone watching. But that's not what we're looking at here. This is not about copyright violation. This is about... Isn't it about the valuation of the scope of it? Yeah, it's about, okay, when these CSOs pay this license to the government, the question is for all those people who own TV shows, what share should they get of that? There's nothing about a copyright violation in that scenario. The question is, is that, okay, I own Monday Night Football. I ought to get a big share of that. Okay, I own Joe's Fishing. I should get some share. Okay, it's not going to be as big. The question is how valuable are those programs to the CSO, not who's watching it at home, because it's the CSO that pays. It's not the people at home that pay. No, but it's the people at home who have effectuated the violation. No, there's no violations here, Your Honor. Well, there is. That's why there's forced licensing to cover. There would be a violation in the absence of forced licensing. And then the allocation of the money that comes out of the forced licensing is to the programs, I thought, according to some measure of harm to them. And if you've been harmed, then you're going to get a… I mean, there is a mismatch, which is between the sort of standardized valuation of the forced licensing up front and then the allocation. It does seem to me there's a mismatch there. That's what we're trying to do here, which is extremely difficult. And as everyone almost involved in this has admitted, it's rough justice at best. Yeah. But it is not a question of violation. It's a question of, again, it's not about the individual at home because they have no control over this. They don't pay this. It's the cable guy who does it. It's the cable guy who says, well, I could get ABC from Los Angeles or I could get CBS from San Diego. What do I want to do? Well, CBS has got this programming for, you know, Korean programming, and I've got a bunch of Koreans in my community, so I'll pay a premium for that. That's the thing we have to try to replicate here, not the person sitting at home saying, I like watching Monday Night Football more than I like watching… But they're not completely divorced because the viewership is going to drive programming decisions presumably in the future. The testimony by the people who do this say it does not. And the reason why is because when the CSO makes that purchase, he has no idea in the future how much viewership there is going to be, number one. And number two, viewership is secondary to him to what his overall cornucopia of programming looks like, and is he addressing the people in his community? I would hope that the cable providers care about viewership because they're trying to provide a popular product. And so it's iterative, but it certainly has to be relevant. That's not their testimony. That's all I can tell you. I know I've gone over answering some of the questions. If I may have some time, I would appreciate it. Thank you. Good morning. May it please the Court. Molly Silfen for the Copyright Royalty Board. I am happy to rest on our briefs or answer any questions the Court has for us. Okay. Thank you. I mean, I found the sanction or the ire at the labeling of the subpoenas a little bit odd. Can you explain to us why that was seen as so out of line? Sure. I'm happy to talk about that. So as far as the Harbor testimony went, the judges looked at this issue and found that both sides had sort of behaved badly with respect to this deposition, and they were faced with a binary choice. They could admit the testimony or exclude it. And so they chose to admit it based on the fact that SDC had twice asked for a subpoena and been refused based on the statutory language. And so the judges found it very important that it be very clear and issued an order specifically to this effect that this was not a subpoena, and SDC failed to remove subpoena from the requests and issued not just one but four of these requests. And the judges legitimately need to be able to enforce compliance with their orders. They have these very contentious proceedings in which there are lots of parties and they all want a bigger share of this pot, and the judges need to know that when they issue an order that it will be followed precisely. And in this case, they in the moment thought that SDC had not precisely followed the order and weighed that against the sort of bad behavior on the other side and chose to admit it. Well, in retrospect, isn't this much ado about nothing? It is. It is. You still have to overcome the presumption, and the record indicates they want to overcome the presumption. That's exactly right. It seems like a silly thing that they did. You vote bad, let's see who will sanction. That's what we're seeing. It looks pretty silly. But if you wipe that away, I don't know what difference it makes. I agree. It does not make a difference if you wipe it away. I disagree with calling it a sanction, but certainly it makes no difference. It looked like you were smacking someone, and I wasn't sure why. But in any event, they're offended by it, but I'm still at bottom line because I don't know what difference it makes. That's exactly right, Your Honor. In the end, it doesn't make any difference, given the presumption. And SDC doesn't contest the board's decision that it doesn't have significant power, but I'm just curious, how is a party supposed to get evidence if they can't have a witness who's reluctant appear and be cross-examined? Well, I guess this is the way. So third-party evidence, let me back up and say the statute specifically says that subpoenas are available only in rate-making proceedings. Exactly, not only. That would make it easier. That is true. But the statutory construction principle of expressio unius leads to the conclusion that they do not have the subpoena power in these distribution proceedings. That's very strange. I mean, just thinking if there's a lot of money riding on it and people are, as you said, they're very contentious. It's just everyone's going to come in with self-serving information. It's hard to see how that serves your fact-finding. Well, there are still opposing parties here, and they still do have full discovery from other parties. Thank you, Your Honor. All right. Thank you. Okay.  Thank you, Your Honor. We weren't twice refused in our request for subpoenas. We made a request. We withdrew it due to timing issues, and then we made it again, and we lost that motion. We don't think we should have lost, but we did. We then went at the board's own suggestion and asked for a request. With regard to the argument that it wouldn't have made a difference even if this testimony had been excluded, this deposition had been excluded, we think that that's speculation. The board's opinion says that we failed to rebut IPG's evidence. The evidence, the only evidence that the board was referring to there was the deposition testimony. We did have evidence that the board admitted, the Senate report that the board admitted, for the purpose of rebutting the presumption. The board found that it didn't need to determine whether merely offering evidence to rebut the presumption would be sufficient to the bursting bubble theory, would be sufficient to overcome the presumption. Moreover, in a subsequent proceeding, we now, I always said, certainly the Senate report is not the best evidence of what the agreements are. The best evidence would be the agreements, which Kenneth Copeland, which Eagle Mountain refused to produce. In a subsequent proceeding, we now have, pursuant to a motion to compel, the actual agreements. That's pending before the board right now. We will find out eventually how the board is going to rule on this question. But as to the 1999 case, we don't know yet. It could be on remand the board could have discretion to allow us to present the actual agreements. But at any rate, this record is silent as to whether our evidence was sufficient to overcome the presumption. These are the Copeland-Eagle Mountain agreements? Yes, we have them now, Your Honor, yes. And what do they say? I'm a little bit reluctant to answer because they are subject to a confidentiality order. Then you shouldn't say. But the parties dispute their meaning. They say, consistent with the Senate report, that Eagle Mountain, that Kenneth Copeland and Gloria Copeland, they're two different agreements but they're basically identical, own their works of authorship. And then those works of authorship are defined by reference to a non-exclusive list. We argue that television programs, as is consistent with the Copyright Act, as is consistent with case law on this subject, television programs are in fact works of authorship, not excluded by these agreements. Therefore, because these were not works for hire, Kenneth Copeland and Gloria Copeland are the copyright owners, and IPG argues the opposite. And we're having our day in court on that question before the Copyright Royalty Court. We did not get our day in court on that question in the 1999 proceedings, and that's what we're asking for. Beyond that is speculation. We would like our opportunity to present the best available evidence and argue the case on the ownership of Kenneth Copeland programming, and we would like the opportunity to challenge the Board's failure to give us the value of Oral Roberts programming. And if, just putting this in common sense terms, they represent Eagle Mountain, they don't represent Kenneth Copeland, therefore it counts if it's Eagle Mountain, it doesn't count if it's Kenneth Copeland, but if Eagle Mountain is Kenneth Copeland's agent, does it make a difference? So, well, Eagle Mountain would be Kenneth Copeland's employer. Kenneth Copeland proclaims publicly that he receives no salary for his ministry. But he receives royalties, maybe. So it's putting him, that's sort of why this is being resisted on the other side. And you're trying to make something out of that. And here I don't want to speculate. However, there certainly is evidence to suggest that Eagle Mountain is not the owner of the programming. Kenneth Copeland and Gloria Copeland personally are not claimants in the proceeding, therefore are not personally entitled to recover. As far as an agency relationship, the case law on this subject, I don't think that there's any evidence of an agency. It's an employer relationship, that is to say Eagle Mountain is the employer of Kenneth and Gloria Copeland. That doesn't make Eagle Mountain entitled to make a claim on their behalf. The case law would suggest that the owner of an exclusive license to distribute programming would be entitled to make a claim. However, the evidence is not and does not show that Eagle Mountain is an exclusive licensee of the works, the works of authorship that are owned by Kenneth and Gloria Copeland.  Thank you. Thank you, Mr. McLean. Mr. Boyston, I think you are also out of town. We'll give you two minutes. Thank you. I'll be very brief. I think Judge Edwards summed up this issue entirely correctly. It's silly. With regard to the evidence that they own, the evidence they do have, which is the Senate report, I want to read you the part of the Senate report that makes reference to the TV programs, as opposed to works of authorship, books, things like that. Kenneth Copeland Ministries subsequently stated in its response to the committee that, quote, the church records, the church, mind you, not Mr. or Mrs. Copeland, the church records, produces, and distributes a large portion of its own media and Internet products. In this regard, the church has full-time paid personnel devoted to the production of the church's television programming. That is consistent with what is in those contracts. And that is consistent. And the church is Eagle Mountain or the church is Kenneth Copeland Ministries? It's Kenneth Copeland Ministries, Eagle Mountain. The church is the entity that IPG represents in these proceedings. And that is consistent with the deposition transcript. That is consistent with the declarations that were submitted that were not taken because of the existence of deposition transcripts. So there simply is nothing to this. And as I say, the agreements are consistent with that. The agreements do not have anything in it saying that Kenneth Copeland individually has mainlined the profits from his TV, this TV show, or these royalties or anything like that. This is all a gigantic fishing expedition that has ended up in your laps. Unless there are further questions, thank you. Thank you. Ms. Tilghman, I'm assuming you do not need rebuttal time? No. Or you do? That's correct. Okay. All right. Thank you. The case will be submitted.
judges: Brown, Pillard, Edwards